[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14968

_____

D.C. Docket No. 1:12-cv-21894-JLC


MARBEL MENDOZA,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 31, 2014)

Before TJOFLAT, HULL and JORDAN, Circuit Judges.

HULL, Circuit Judge:

Marbel Mendoza, a Florida inmate, filed a 28 U.S.C. § 2254 petition for a

writ of habeas corpus, raising multiple challenges to his capital conviction for first

degree felony-murder and death sentence.  The district court denied Mendoza's petition.  This Court granted Mendoza a certificate of appealability ("COA") as to one issue:  "Whether defendant Marbel Mendoza's trial counsel rendered ineffective assistance of counsel in the investigation and presentation of mitigation evidence during the penalty phase of the 1992 trial."

Having considered the state court record, the district court's thorough order, and the parties' submissions, and with the benefit of oral argument, we affirm the district court's denial of Mendoza's § 2254 petition.

## I.  CRIME, GUILT PHASE, AND VERDICT, 1992–1994

### A.    Robbery and Murder, 1992

In 1992, petitioner Mendoza asked an acquaintance, Humberto Cuellar, to help him rob Conrado Calderon, who owned a mini-market.  Humberto agreed and recruited his brother, Lazaro Cuellar, to drive the getaway car.  To plan for the robbery, Mendoza, Humberto, and Lazaro went to Calderon's house in Hialeah, Florida, where they observed Calderon's morning routine.[1]

Before dawn on March 17, Mendoza and the two Cuellar brothers went to Calderon's home and waited on Calderon to emerge.  Mendoza had a .38 caliber revolver and Humberto carried a 9 mm automatic pistol.  Around 5:40 AM,

---

[1]We draw these facts from the Florida Supreme Court's decision in Mendoza's direct appeal.  See Mendoza v. State ("Mendoza I"), 700 So. 2d 670, 672–73 (Fla. 1997).

Calderon appeared at his front door, at which point, Mendoza and Humberto hid behind a hedge.

Calderon left his house and walked toward his Ford Bronco. Humberto Cuellar and Mendoza approached Calderon from behind and held Calderon in his driveway between the Ford Bronco and a Cadillac, also parked there. A struggle ensued, during which Humberto hit Calderon on the head with his 9 mm pistol. Calderon pulled out a .38 special revolver and shot Humberto in the chest. Humberto, injured, retreated to Lazaro Cuellar's getaway car. As Humberto ran to the car, he heard other gun shots. Less than one minute passed before Mendoza also arrived at Lazaro's car. Mendoza told Humberto and Lazaro that he shot Calderon. Calderon died.

Lazaro drove the car, with Mendoza and Humberto inside, to a nearby hospital. Mendoza instructed Humberto to say that Humberto was shot by a person trying to rob him. Police later arrived at the hospital and recovered Humberto's fully loaded 9 mm pistol from the getaway car. Officers observed hair embedded in the slide, which was consistent with the gun having been used to hit someone in the head. The police took Humberto to the Hialeah police station where he gave a sworn statement. Humberto's statement recounted how Mendoza planned the robbery and Mendoza shot Calderon. Humberto's trial testimony was consistent with the statement.

3

Police investigated the murder scene, where they found, under Calderon's dead body, a gun and a bank bag containing $2,089 in cash. They found additional cash in Calderon's pockets and wallet. Police also discovered Mendoza's finger and palm prints on the Cadillac parked in Calderon's driveway.

Calderon was killed by four bullet wounds, all of which came from a .38 caliber revolver—the type of weapon Mendoza had. Three shots were fired from point-blank range, with the last shot fired from less than six inches away. The bullet lodged in Humberto's spine was consistent with being fired from the gun found beneath Calderon.

One week after the murder, officers arrested Mendoza. By that time, Mendoza had shaved his head and moved out of his normal residence.

**B.      Indictment, Appointment of Counsel, and Not Guilty Plea, 1992**

On March 31, 1992, a state grand jury indicted Mendoza for six offenses, including the first-degree felony-murder of Calderon.[2] The trial court appointed two experienced private attorneys, Arnaldo Suri and Barry Wax, to represent Mendoza.

The Cuellar brothers were also charged in the same indictment charging Mendoza. Lazaro Cuellar pled guilty to manslaughter, conspiracy, and attempted

---

[2]These other offenses were: (1) conspiracy to commit robbery; (2) attempt to commit armed robbery; (3) armed burglary of a dwelling; (4) use of a firearm during the commission of a felony; and (5) possession of a firearm by a convicted felon.

4

armed robbery.  He received a ten-year sentence.  Humberto Cuellar pled guilty to second-degree murder, conspiracy, attempted armed robbery, burglary, and use of a firearm in the commission of a felony.  He received a twenty-year sentence. Mendoza pled not guilty and proceeded to trial.

## C.    Pre-Trial Mental Health Evaluations of Mendoza

Prior to trial, Mendoza's counsel had Mendoza fully evaluated by two mental health experts: Dr. Leonard Haber and Dr. Jethro Toomer.  In the penalty phase, Mendoza's counsel had Dr. Toomer testify, but did not call Dr. Haber. Although Dr. Haber did not testify, we include his report to show the completeness of trial counsel's pre-trial investigation.  We thus review what Dr. Haber reported and then what Dr. Toomer reported.

During August and September of 1993, Dr. Haber, a licensed psychologist, examined Mendoza six times.  Because Mendoza later argues that other mental health professionals should not have evaluated him in English, his second language, we note that Dr. Haber conducted his examinations in Spanish with the assistance of a trained bilingual interpreter.  In his 1993 report, however, Dr. Haber noted "Mendoza understood English."

Dr. Haber reviewed police and medical examiner reports pertaining to Mendoza's offense, the indictment, Mendoza's post-arrest statement, and a Cuban doctor's summary of Mendoza's clinical history from his childhood in Cuba.

Dr. Haber's 1993 report described Mendoza's "extensive and mixed substance abuse problem beginning at age 11 or 12." In his 1993 interview with Dr. Haber, Mendoza reported that he started using crack cocaine four or five years earlier, and he "claimed to have used 'acid' for 'almost a full year.'" Mendoza "experimented with [Q]uaaludes and 'black beauties' as well."[3]

As to Mendoza's mental state, Dr. Haber's report noted that Mendoza "admitted to having entertained homicidal ideations" and "described having experienced visual hallucinations . . . while under the influence of drugs." Mendoza experienced "auditory hallucinations since about age 7." He told Dr. Haber that "the devil talked to him and that it tells him, 'you have to do something wrong to somebody.'"

Dr. Haber concluded that: (1) Mendoza was not a candidate for involuntary hospitalization; (2) Mendoza was a person "with a history of [a] major mental disorder since childhood," which was not treated after his arrival in the United States; and (3) Mendoza "likely was acting with impaired judgment at the time of the offense due to his intake of alcohol and other illegal substances." Mendoza's drug use may have resulted from Mendoza's desire to "self medicate in response to

---

[3]The record here does not explain what Quaaludes and black beauties are. But we have stated that "Quaalude" is the brand name for the drug Methaqualone, "a non-barbiturate sedative-hypnotic that is a general depressant of the central nervous system." Hardwick v. Crosby, 320 F.3d 1127, 1168 n.159 (11th Cir. 2003) (quotation marks omitted). "Black beauties are the street name for a type of amphetamine drug." Howard v. Moore, 131 F.3d 399, 421 n.20 (4th Cir. 1997) (en banc), abrogated on other grounds by Miller-El v. Dretke, 545 U.S. 231, 125 S. Ct. 2317 (2005).

6

distressing symptoms of mental disorder." Dr. Haber indicated that Mendoza's conditions—including his "long standing history of major mental illness and polydrug abuse"—"qualify for consideration as possible mitigating factors in a sentencing hearing."[4]

During November and December of 1993, Dr. Toomer, a licensed psychologist, interviewed Mendoza four times in English. Dr. Toomer's 1994 report stated: "On each occasion, there appears to be some deterioration in the subject's overall mental status functioning as reflected by his increasingly depressed state, disjointed communication, responsiveness to internal stimuli, tearfulness and reports of auditory and visual hallucinations."

Dr. Toomer found that there was "evidence of a major affective and cognitive impairment, reflected in communication that [was] halting, sluggish, and impoverished and characterized by [Mendoza] having difficulty generating thoughts." Mendoza's performance on the Bender Gestalt Designs Test ("Bender Gestalt") indicated "schizophrenia, as well as organic impairment." Mendoza took the Carlson Psychological Survey, which indicated that Mendoza suffered "from feelings of inferiority, insecurity and poor self esteem." Dr. Toomer opined that

---

[4]On January 27, 1994, Dr. Haber evaluated Mendoza again after Mendoza's attorneys requested, and the trial court ordered, a competency evaluation. Dr. Haber determined that Mendoza was "competent to proceed to trial." Dr. A.M. Castiello, a psychiatrist, evaluated Mendoza on January 28 and likewise concluded that Mendoza "possess[ed] a factual as well as a rational understanding of the proceedings against him" and was "capable of assisting counsel in his defense and of standing trial."

"[b]rain damage" could be a cause of such feelings, as well as "a history of drug and alcohol abuse." In his pre-trial report, Dr. Toomer set forth Mendoza's performance on these tests. At trial, Dr. Toomer explained more about what the tests measured or assessed. We discuss that testimony later on.

Before trial, Mendoza's attorneys asked the trial court to appoint a third mental health expert—Dr. Jules Tropp, an addictionologist. The trial court denied the motion.

## D.    Guilt Phase, 1994

During the guilt phase of Mendoza's 1994 trial, the evidence overwhelmingly established that Mendoza planned the robbery, participated in it, and shot and killed Calderon. Specifically, Humberto Cuellar testified that Mendoza shot Calderon.[5] The four bullets from Calderon's body were from a .38 caliber revolver like Mendoza's. The hospital admissions clerk testified that Mendoza was with Humberto when he arrived with a gunshot wound on the morning of the murder. Mendoza's finger and palm prints were on the Cadillac parked near Calderon's body.

On February 8, 1994, the jury found Mendoza guilty on all counts, including first-degree felony murder.[6]

---

[5]Lazaro Cuellar did not testify.

[6]The felon-in-possession-of-a-firearm count was not submitted to the jury.

8

## II. STATE'S PENALTY PHASE EVIDENCE

The penalty phase before the jury began on March 11, 1994.

### A.    Armed Robbery of Robert Street

At Mendoza's 1994 trial, the State established the aggravating circumstance that Mendoza was previously convicted of another violent felony. See Fla. Stat. § 921.141(5)(b). Specifically, the State introduced Mendoza's 1993 convictions for robbery with a firearm, aggravated battery, burglary of a conveyance with a firearm, and use of a firearm in the commission of a felony—all stemming from his 1992 armed robbery of Robert Street. Mendoza received a 12-year sentence for these offenses.

The State also called Street, the victim of Mendoza's criminal behavior. The State used Street's testimony to establish the circumstances surrounding Mendoza's previous violent felony convictions. Street testified that, on February 14, 1992 (approximately one month before the Calderon murder), he was assaulted and robbed at around 11:30 PM as he returned to his Miami townhome. Street exited his vehicle, turned around, and saw two men approaching him. Street identified Mendoza as one of the two men who assaulted him that night. Mendoza carried a gun and beat Street with it.

9

Mendoza instructed Street to lie down, face-forward, on the ground. In a "[v]ery agitated" tone, the assailants ordered Street to "give them [his] money." Mendoza repeatedly poked Street in the face with the barrel of the gun.

Mendoza and the other man took Street's watch, wedding ring, wallet (containing $100), car keys, and residence keys. They ransacked Street's car, but took nothing. They came back to Street, still lying on the ground, "and got crazy." The attackers punched Street in the back of the head, poked him with the gun "over and over," and repeatedly asked him "where [the] money was." They refused to believe that Street had given them all the money he had.

The men did not enter Street's residence, but they threatened to do so. After Street told them his wife was inside, one man said, "'We are going to go in there and get the money.'" Mendoza struck Street forcefully beneath the left eye "in an effort maybe to knock [him] out." The other man twice said, "'Just shoot him.'"

## B.    Dr. Anastasio Castiello

Dr. Anastasio Castiello, a psychiatrist, also testified. Prior to trial, Dr. Castiello interviewed Mendoza in Spanish to complete a court-ordered psychiatric evaluation only for competency to stand trial. During the interview, Mendoza responded to questions "rather vaguely" and Dr. Castiello "had to pinpoint him as to details." Dr. Castiello considered Mendoza "to be a totally unreliable informant."

10

For example, Dr. Castiello discounted Mendoza's drug abuse claims.  Dr. Castiello testified that "when any kind of situation is unpleasant, there is a tendency to overemphasize the [drug] usage or misusage."  Mendoza talked to her about his drug use.  Mendoza told Dr. Castiello about "dreams or fantasies" he experienced while sleeping.  Dr. Castiello testified that Mendoza "appeared to be making sort of an effort to appear that he was having all those things that nobody else has."

### III.  MENDOZA'S PENALTY PHASE EVIDENCE

One part of Mendoza's attorneys' mitigation strategy in the penalty phase was to show that Mendoza was not more culpable than his co-defendants—the Cuellar brothers—who received non-capital sentences.  To this end, they called Humberto Cuellar, who testified that the three defendants had plotted to rob Calderon with guns, but that none of them ever intended to kill him.  They did not know that Calderon was armed until Calderon drew his gun and shot Humberto.  Trial counsel Wax had the contents of the judgments in co-defendants Humberto's and Lazaro's cases read to the jury.

Trial counsel also pursued a mitigation strategy of showing that Mendoza had mental health problems and had experienced a traumatic childhood.  We recount the extensive evidence about Mendoza's mental health, childhood, and substance abuse.

11

A.    **Nilia Mendoza**

Mendoza's mother, Nilia Mendoza, testified at length about Mendoza's tumultuous and tragic childhood.  Ms. Mendoza testified that her son was born in 1966 in Havana, Cuba.[7]  As a newborn, Mendoza "would always get sick" and received surgery at age one for water in the testicles.  He received the same surgery a second time and developed asthma and vomiting problems.  Mendoza also suffered "attacks," during which he would "lose consciousness" and would have to be taken to a psychologist for treatment.

As he grew older, Mendoza became "[v]ery restless, very dominant."  Mendoza would get in fights with other children at school in Cuba.  When Mendoza was approximately three-years-old, his mother took him to see a psychologist at a Cuban hospital.  Mendoza received psychological treatment at this hospital for approximately two years, from ages three to five.  He was treated at a different hospital in Cuba from ages six to twelve.  These subsequent doctors told Ms. Mendoza that her son suffered from "aggressive conduct . . . like schizophrenia."

In 1980, Ms. Mendoza, with her husband and her son, attempted to leave Cuba by seeking refuge at the Peruvian embassy in Havana.  Ms. Mendoza explained, "We jumped the fence and we got into the embassy."  At that time,

---

[7]Mendoza was his parents' only child.

12

"[t]here were ten thousand people inside the Peruvian embassy." Because there were so many people, the Mendoza family left the embassy after obtaining a permit go to the United States. The Mendozas returned to their home in Havana.

For the next week, the police came "every once in a while to get [the family] out [and] take [them] to the airport and then . . . let [them] go somewhere in Cuba so that the police would hit [them] and then [they] would go back home." Ms. Mendoza affirmed that all three family members were beaten during this period. Mendoza was about 14-years-old at the time.

Eventually, the police allowed the Mendozas to leave Cuba, telling them that they could go to the United States. However, the family went to Costa Rica for a day, and then to Peru. They stayed in Peru for two years and three months, during which time they lived in tents in a city park. Approximately 800 other Cuban refugees lived with the Mendozas in this tent village, with each tent housing between 16 and 18 people. Ms. Mendoza testified that the family did not have access to medical care. Her son suffered a nervous crisis and developed typhoid, and Mendoza's father lost his hearing and had a nervous breakdown.

The Mendozas filed applications for asylum in the United States, which were not granted. Eventually, the family left Peru, traveled to Mexico, and entered the United States by crossing the Mexican-American border. In August 1982, the

13

Mendozas settled in Miami, where Mr. Mendoza found work in construction.  Her son was around 16-years-old at the time.[8]

Ms. Mendoza testified that, when the family first arrived in Miami, they registered their son at Miami High School.  Initially, "he was doing all right, but then he had trouble."  Mendoza dropped out of high school and took night classes.  Ms. Mendoza never arranged for her son to receive mental health treatment in the United States because "he never wanted to."

As to when she suspected Mendoza was using drugs, Ms. Mendoza answered: "Well, really in the beginning, I didn't realize because I didn't know much about it.  But afterwards, I did."  Ms. Mendoza occasionally found marijuana cigarette butts in her son's bedroom, and he "was always asking for money."  Mendoza started to steal his mother's jewelry.  On cross-examination, Ms. Mendoza acknowledged that she never observed Mendoza using other illegal drugs or alcohol, but stated that she "kn[e]w little about drugs."  She did once have to go and pick Mendoza up from a bar and observed him drunk.

Mendoza obtained his general equivalency degree ("GED") and performed various part-time jobs.  He worked at a Kentucky Fried Chicken, for a construction company, and then for a plumber.

---

[8]While Ms. Mendoza, at one point, said that Mendoza was 14-years-old when he arrived in the United States, she also testified that Mendoza was born in 1966 and came to the United States in 1982, which made him approximately 16 at that time.

14

Ms. Mendoza testified that her son later married a woman whom he had met in the refugee camp in Peru. They married in the United States and had two children. Mendoza's daughter, who was five at the time of the trial, was born with birth defects. According to Ms. Mendoza, her son "had a nervous attack" when he learned of his daughter's birth defects. Mendoza's marriage did not last. By the time of Mendoza's 1992 offenses, he was divorced, no longer living with his children, and his former wife would not let him see the children.

## B.    Medical Records from Cuba

Trial counsel did not rely exclusively on Ms. Mendoza's testimony to show Mendoza's difficult upbringing. They also obtained, via Mendoza's relative in Cuba, a doctor's summary of Mendoza's childhood medical records in Cuba, which were consistent with Ms. Mendoza's testimony. The records were signed by Dr. Pedro A. Rivera Richards and contained the seal of the Cuban Ministry of Public Health. After Ms. Mendoza's testimony, the defense proffered these medical records. The records were in Spanish and were read to the jury in English through an interpreter.[9] They documented Mendoza's mental health problems and treatment from ages 2.5 to 5 (1968 to 1971), and then from ages 10 to 13 (1976 to 1979).

---

[9]The trial court overruled the State's hearsay objection to the admission of the medical records.

15

The medical records stated that Mendoza's "[m]ain diagnosis" was "definitive dominant character with aggressive predominance and schizophrenic and schizoid characteristics." His other diagnoses were "fears, nocturnal fears during infancy, and enuresis." According to the records, Mendoza first received psychiatric care when he was two-years-old. From ages two to five, Mendoza received "specialized treatment and family counseling." At five-years-old, he was released from treatment.

At age ten, Mendoza went back to a pediatric psychiatrist in Cuba "because he was not progressing in school" and "found himself isolated." Mendoza had many "fights and brawls" inside and outside school in Cuba. Mendoza received "all types of psychotherapy, talks and meetings and family sessions" as well as "special school therapy for his conduct and specialized medical treatment." He was evaluated "by the whole medical group," including psychiatrists and psychologists and subjected to various psychometric tests.

When he was 13-years-old, Mendoza reported having "visions, hallucinations and auditive types of sensations of persons calling him." This led the doctors to diagnose "characteristics of schizophrenic and schizoid characters."

## C.    Gloria Dardy-Porter

Mendoza's next witness was Gloria Dardy-Porter, the medical records custodian for the State Corrections Rehabilitation Services. Ms. Dardy-Porter

16

authenticated Mendoza's prison medical records, which were admitted into evidence. These records showed that, while incarcerated prior to trial, Mendoza received medical treatment for, inter alia: (1) chronic right leg pain resulting from a gunshot wound he suffered in 1988; (2) mental health problems, such as hearing voices and experiencing other hallucinations; and (3) routine ailments, like a sore throat, cough, and constipation.

## D.    Dr. Jethro Toomer

After establishing Mendoza's difficult background and serious mental health issues, trial counsel called on Dr. Toomer, one of the psychologists who had evaluated Mendoza. Dr. Toomer testified about Mendoza's multiple psychological problems and lack of treatment for them. Trial counsel obtained Dr. Toomer's report before trial. We now recount his trial testimony.

Dr. Toomer was imminently qualified as he: (1) had bachelor's, master's, and doctoral degrees in psychology; (2) was licensed to practice psychology in Florida; (3) had been a psychologist for 17 years; (4) was a "diplomat of the American Board of Professional Psychologists"; (5) was published in various medical journals and had recently published a book on psychology; and (6) had testified as an expert in psychology numerous times since 1975. Dr. Toomer was a

17

professor at Florida International University, where he directed the graduate mental health program.  He also had a private clinical and forensic psychology practice.[10]

Dr. Toomer met with Mendoza four times at the prison.  Dr. Toomer performed his evaluations in English, not Spanish, because there was no language barrier between Mendoza and him.

Dr. Toomer first obtained from Mendoza a "psychosocial history," which was "a process or series of questions" indicating "overall functioning, place of birth, demographic data, information regarding childhood, parental relations, sibling relationship, prior medical history, [and] prior areas of problems or difficulty."  Dr. Toomer stated, "[i]n other words, it's a life history of the individual's functioning from earlier on up to that point."  As to his childhood in Cuba, Mendoza told Dr. Toomer "that he had received treatment and it had something to do with his having supposed experiences with multiple personalities."  Mendoza "also described . . . an extensive drug history that dated back to the age of nineteen involving the use of alcohol, marijuana and some crack cocaine."

Dr. Toomer testified that Mendoza's "multiple personalities" diagnosis indicated "something rather serious," and Dr. Toomer was concerned that Mendoza had not received any treatment in the United States.  Dr. Toomer

---

[10]Dr. Toomer testified that "forensic psychology" refers to "the interaction of psychology and the law," whereas "clinical psychology" focuses on "the impact of human behavior and treatment and diagnosis of the mentally ill."

18

suspected that Mendoza resorted to illegal drugs as a form of "self-medication" for his mental health problems.

Dr. Toomer testified about his psychological testing of Mendoza. He administered the Bender Gestalt Designs, which "is a screening instrument where the individual is asked to . . . draw on a piece of paper with a pencil . . . drawings of symbols that he observed on a particular card." "The discrepancies between the drawings and what the individuals produce is indicative of functioning or lack of functioning or deficiencies in functioning in a variety of areas . . . and organicity or brain damage." Mendoza's performance on the Bender Gestalt indicated "poor impulse control and high levels of anxiety and aspects of poor judgment."

Dr. Toomer also administered the Carlson Psychological Survey, which "measures an individual's overall functioning across four basic dimensions and . . . compares [the individual's] functioning against individuals who have been charged with or accused of crimes." The test "assess[es] functioning across a variety of areas such as chemical abuse, thought disturbance, anti-social tendencies and self depreciation." It also has various mechanisms to detect whether an individual is "faking or not responding appropriately" to the psychological evaluation.

Dr. Toomer described Mendoza's performance on the Carlson Psychological Survey as "difficult." The results indicated that Mendoza suffered from "inferiority, poor self esteem, impulsivity and irrational behavior," as well as

19

"changes in mood shifts or behavior changes from time to time." Dr. Toomer suspected brain damage as a cause for Mendoza's behavior. The test showed that Mendoza was in the 99th percentile for chemical abuse and in the 99th percentile for "thought disturbance." Dr. Toomer explained that "thought disturbance" refers to "the degree to which there are perceptual disturbances or difficulty in terms of reality testing," and one way to measure thought disturbance is by asking "whether or not the person experiences hallucinations, audible or visual." As for anti-social tendencies, referring to "the tendencies of an individual to violate social norms," Mendoza was in the 85th percentile. Mendoza was in the 95th percentile for self depreciation.

During later meetings with Dr. Toomer, Mendoza demonstrated "heightened agitation, nervousness, sweating, [and] a sense of being out of touch with reality." Mendoza was unable to remember who Dr. Toomer was from one visit to the next and complained of auditory and visual hallucinations.

Dr. Toomer concluded that Mendoza was "suffering some very significant deficits in terms of his reality testing and they [were] reflected in impairment both in terms of cognitive ability as well as affective or emotional ability." Dr. Toomer also suspected brain damage, which "would not be inconsistent given [Mendoza's] history of drug and substance abuse." Seeing no evidence of anti-social personality disorder, Dr. Toomer believed that Mendoza could be rehabilitated.

20

On cross-examination, Dr. Toomer acknowledged that Mendoza did not actually state that his drug use was a means of "self-medication" for his mental health problems.  Mendoza had only told Dr. Toomer that "he took the drugs because it calmed him down and helped him to feel better."  This statement led to Dr. Toomer's "utilization [sic] that he was using drugs for self-medication."

Over trial counsel's objection, the State asked Dr. Toomer if he was aware that Mendoza had "a pending trial in other robberies using a firearm[?]"  Dr. Toomer was aware of the pending charges.[11]  Nevertheless, based on his "mental status evaluation" and Mendoza's history, he believed Mendoza could be rehabilitated.  Dr. Toomer testified that he did not find anything indicative of anti-social personality disorder.

## IV.  THE STATE'S REBUTTAL PENALTY PHASE EVIDENCE

As rebuttal, the State called Detective Roberto Navarro of the Miami Police Department.  A week after the murder, Detective Navarro arrested Mendoza at his parents' home and brought Mendoza to the police station.  There, he and another officer interrogated Mendoza for approximately four hours.

Detective Navarro asked Mendoza "if he used drugs or alcohol."  Mendoza "said he did not."  Detective Navarro had no trouble speaking with Mendoza—

---

[11]The record does not tell us exactly what the pending charges were.  The Florida Supreme Court, on direct appeal, concluded the trial court erred in allowing the State to bring up "pending charges" while cross-examining Dr. Toomer.  Nevertheless, the state supreme court found this error harmless beyond a reasonable doubt.  See Mendoza I, 700 So. 2d at 677–78.

Mendoza did not appear to be under the influence of drugs or alcohol and "understood and answered clearly and exhibited the processes of a normal person." Mendoza's memory appeared to be accurate and Mendoza "was very relaxed."

## V.  PENALTY PHASE CLOSING ARGUMENTS AND VERDICT

### A.    The State's Closing Argument

In its closing argument, the State contended that it had proven certain statutory aggravating circumstances beyond a reasonable doubt.  First, Mendoza was previously convicted of another "felony involving the use . . . of violence to the person"—specifically, the armed robbery and battery of Street.  See Fla. Stat. § 921.141(5)(b).  Second, Mendoza killed Calderon "for pecuniary gain."  See id. § 921.141(5)(f).  Third, Mendoza committed his capital felony while he was engaged in the commission of a robbery.  See id. § 921.141(5)(d).

The State argued against the presence of any mitigating circumstances.  As for the non-capital sentences of Humberto and Lazaro Cuellar, the State pointed out that there were material differences between Mendoza and the Cuellar brothers beyond the obvious fact that Mendoza was the shooter.  For example: (1) Lazaro stayed in the car, whereas Mendoza did not; (2) Humberto was shot during the offense, whereas Mendoza shot Calderon four times; (3) Humberto had no prior criminal record, whereas Mendoza had a prior robbery conviction; (4) Humberto

22

and Lazaro entered into plea agreements, whereas Mendoza pled not guilty; and (5) Mendoza planned the robbery and recruited Humberto and Lorenzo.

Next, the State argued that Mendoza was not "under the influence of extreme mental or emotional disturbance" at the time of the murder. See Fla. Stat. § 921.141(6)(b). The State acknowledged that Mendoza, while in prison, had been prescribed psychiatric medication and that he had some history of emotional problems during childhood. The State asked the jury to focus, however, on his mental state at the time of the murder in 1992.

The State maintained that Ms. Mendoza's testimony did not cast doubt on Mendoza's culpability. Although Dr. Toomer reported substance abuse, the State argued it was based on Mendoza's self-reporting, and thus unreliable. The State also pointed out that Mendoza did not seek mental health treatment upon arriving in the United States. The State challenged Dr. Toomer's testimony, arguing, inter alia, that Dr. Toomer was biased towards the defense. The State disputed Dr. Toomer's opinion that Mendoza could be rehabilitated.

## B.    Mendoza's Closing Argument

Defense attorney Wax presented Mendoza's closing argument. Wax first emphasized that Mendoza had never planned to kill Calderon. He pointed out that Mendoza only robbed Street, though he could have killed him. Mendoza and the Cuellar brothers intended to only rob Calderon, but Calderon fired a shot. Wax

23

stressed that the fact that Calderon fired first was a "very important factor" in what had happened.

Wax then turned to the mitigating evidence about Mendoza's background and mental health problems. He reminded the jury that, unlike aggravating circumstances, mitigating circumstances need not be proven beyond a reasonable doubt. Wax stated that "[t]he two witnesses [who] played the most significance were Mrs. Mendoza . . . and Dr. Toomer." Ms. Mendoza told the jury about Mendoza's "difficult childhood."

Wax disputed the State's suggestion that Mendoza's drug addiction was not severe. Wax asked the jury to consider these non-statutory mitigating circumstances: (1) "family background"; (2) "alcohol and drug use or abuse"; (3) "mental problems"; (4) "the circumstances of the offense itself"; and (5) the non-capital sentences received by Mendoza's co-defendants.

As to Ms. Mendoza's not finding drugs other than marijuana in Mendoza's room, Wax pointed out, "[p]arents many times are the last to know." As for Mendoza's failure to seek treatment in the United States, Wax explained, "that is the hallmark of any addict."

Challenging the State's contention that Dr. Toomer was biased, Wax emphasized that Dr. Toomer had many years of experience and was previously qualified as an expert. Dr. Toomer's preliminary tests showed "evidence of brain

24

damage," as well as "a major chemical dependency." Wax pointed out that the State did not rebut Dr. Toomer's psychological conclusions. Rather, the State's expert, Dr. Castiello, evaluated Mendoza only once and only for competency to stand trial.

## C.    Jury's Advisory Verdict

By a vote of seven to five, the jury recommended the death penalty.

## VI.  FINAL PENALTY HEARING BEFORE STATE TRIAL COURT

Before the final penalty hearing, two more mental health experts examined Mendoza: Dr. Hyman Eisenstein, at defense counsel's request, and Dr. Gisela Puentes, at the State's request.[12] During the hearing, trial counsel Wax presented Dr. Eisenstein's report and called Ms. Mendoza to testify again. The State called only Dr. Puentes. We review that evidence.

## A.    Dr. Eisenstein's Report and Deposition

Dr. Eisenstein, a neuropsychologist, examined Mendoza six times between March and May of 1994. Prior to meeting Mendoza, Dr. Eisenstein reviewed: Dr. Toomer's report, Dr. Haber's report, Mendoza's post-arrest records, and Mendoza's school records.

---

[12]There is an inconsistency in the record as to whether the doctor's surname is "Puentes" or "Fuentes." The record shows that the doctor signed her report "Puentes," and thus we use that name.

Dr. Eisenstein conducted his examinations of Mendoza in English.  He testified that "clinically, it wouldn't make a difference" whether the tests were conducted in English or Spanish.

Dr. Eisenstein's report, dated May 12, 1994, contained background facts, obtained from Mendoza, including: (1) at age 5, Mendoza had "sleep disturbances" and "night terrors," and he "'was scared to sleep by [himself] and slept with [his] parents'"; (2) Mendoza told Dr. Eisenstein, "'I had a double personality and paranoid schizophrenia'"; (3) Mendoza started using marijuana, alcohol, and crack cocaine upon coming to the United States and used crack cocaine the night before he killed Calderon; and (4) in 1989, Mendoza was shot in the back and suffered a blood clot in his right leg.  Mendoza "was cooperative with the examination," and the "results [were] considered a valid indication of current neuropsychological functioning."

After conducting six general types of neurological tests,[13] Dr. Eisenstein concluded that: (1) "Mendoza present[ed] with mild neuropsychological deficits with greater left hemispheric language related impairment"; (2) "[t]he neuropsychological examination was conducted in English and the left hemisphere

---

[13]These tests were: (1) motor measure tests; (2) sensory perceptual tests; (3) speech/language tests; (4) the Wide Range Achievement Test and Peabody Picture Vocabulary Test, both to test academic achievement; (5) the Wechsler Adult Intelligence Scale-Revised to test intellectual/cognitive functioning; (6) the Wechsler Memory Scale-Revised to test memory; and (7) the Halstead-Reitan Neuropsychological Measures to test neuropsychological functioning.

26

language skills is [Mendoza's] greatest area of cognitive compromise"; and

(3) Mendoza demonstrated "mild impairment of complex information processing

skills which [would] lead to impaired judgment and problem solving skills."  Dr.

Eisenstein added, "Of course, under conditions of both psychological stress as well

as drug and alcohol intoxication, his judgment and reasoning skills [would] be

further compromised."

Dr. Eisenstein acknowledged that his testing uncovered only a "mild"

neuropsychological impairment and that this finding did not rise to the level of the

statutory mitigating circumstance of "extreme" mental or emotional disturbance.

See Fla. Stat. § 921.141(6)(b).  Dr. Eisenstein added that "organic brain damage"

was not something that a person either had or did not have, stating "[i]t's not like

100 percent you do and 100 percent you don't."  His testing looked at "from a

cognitive brain behavior function what you can and cannot do," and could establish

only "mild neuropsychological deficits."

## B.    Dr. Gisela Puentes

The State called Dr. Puentes, a neuropsychologist, who also examined

Mendoza after the jury's verdict.  Dr. Puentes's report, admitted into evidence,

stated that Mendoza was not then taking medication and that Mendoza "denie[d]

auditory, visual, olfactory, or tactile hallucinations."  During the evaluation,

Mendoza's "mood was full and his affect was appropriate."  Mendoza's "attention

span and level of concentration were within normal limits, and he exhibited no difficulty understanding or following verbal instructions." Mendoza's "speech was fluent and clear" and his "thinking was local, coherent, and goal oriented." Thus, Dr. Puentes considered the results of the evaluation valid.

Nevertheless, Dr. Puentes believed that Mendoza may have been motivated to artificially lower the results of some of the neurological tests she administered.

Dr. Puentes administered eight tests, all in Spanish.[14] The vocabulary tests classified Mendoza in the "Average range." Dr. Puentes noted that, compared to earlier testing, Mendoza showed "a marked improvement." Mendoza demonstrated "Low Average abstract reasoning skills" and "Average Verbal Intellectual capacities." Dr. Puentes speculated that Mendoza's scores improved significantly because "previous tests were administered in English." Dr. Puentes concluded that "[t]here was no evidence of Left Hemisphere Brain Damage."

Dr. Puentes also reviewed Dr. Eisenstein's finding of mild impairment and decided to redo in Spanish some tests Dr. Eisenstein had done. Dr. Puentes felt that there were inconsistencies in Dr. Eisenstein's report and believed that "some of the tests would have very easily been influenced by the fact that the tests were

---

[14]The tests were: (1) the Wechsler Adult Intelligence Scale-Revised; (2) the Boston Naming Test; (3) the Rey Auditory-Verbal Learning Test; (4) the Spanish Memory Paragraphs Test; (5) the Peabody Picture Vocabulary Test-Revised; (6) Finger Tapping and Grip Strength Tests; (7) the Portland Digit Recognition Test; and (8) a structured interview.

administered in English," given that Mendoza was a non-native speaker who had only been in the United States for ten years.

Dr. Puentes spoke with Mendoza exclusively in Spanish. Based on her testing, Dr. Puentes concluded that "[n]one of the findings that [Dr. Eisenstein] was alleging that existed were actually there when Mr. Mendoza answered the test in Spanish." Dr. Puentes concluded that Mendoza was "moderately impaired" and "simply a language barrier was interfering with his understanding . . . [and] his ability to express himself in English, and therefore, he was going to look like he was impaired."

## VII.  STATE TRIAL COURT'S SENTENCE

Before the state trial court, defense counsel Wax argued for a non-capital sentence. As Wax began his argument, the state trial court interrupted him and said, "the lawyering in this case has been outstanding." Wax then continued, noting that the jury's advisory recommendation of death was by just a seven-to-five vote, which "ha[d] to be taken into account." Wax asked the state trial court to take into account as non-statutory mitigating circumstances the following: Mendoza's alcohol and drug abuse, Dr. Toomer's finding of a major cognitive impairment, and Mendoza's childhood trauma in Cuba and Peru.

Over a month after the final hearing, the state trial court sentenced Mendoza. The state trial court found these three aggravating circumstances existed:

29

(1) Mendoza was previously convicted of a felony involving violence to the person, see Fla. Stat. § 921.141(5)(a); (2) Mendoza committed a capital felony "while engaged, or was an accomplice, in the commission of, or an attempt to commit, or in flight after committing, or attempting to commit [a] robbery," see id. § 921.141(5)(d); and (3) Mendoza's "capital felony was committed for pecuniary gain," see id. § 921.141(5)(f). The state trial court merged the last two aggravating circumstances and considered them as one.

The state trial court did not find any statutory mitigating circumstances. As for non-statutory mitigating circumstances, the state trial court stated that it had "take[n] into consideration the hardship suffered by [Mendoza] as a child in Peru and the effect of his own child's medical problems" and rejected this mitigating factor. It determined that Mendoza's co-defendants were not similarly situated to him with regard to participation, culpability, or acceptance of responsibility, and therefore, their non-capital sentences were not mitigating circumstances. The trial court stated that it had "taken into consideration" Mendoza's "drug use and dependency" and gave it "minimal weight." The trial court also gave "minimal weight" to allegations of mental health problems not reaching the level of the statutory mitigating circumstance. The court stated that it had considered all of the medical evidence and concluded that Mendoza's mental problems did "not diminish [his] responsibility for the capital crime." As for proportionality, the state

30

trial court determined that, under Florida Supreme Court precedent, the death sentence was not disproportionate just because "a less culpable co-defendant receive[d] a less severe punishment."

In light of these findings, the state trial court sentenced Mendoza to death for his first-degree murder conviction.[15]  On direct appeal, the Florida Supreme Court affirmed Mendoza's convictions and death sentence.  See Mendoza I, 700 So. 2d at 679.

## VIII.  STATE 3.850 EVIDENTIARY HEARING, 2008

On September 5, 2000, Mendoza filed an amended motion for state post-conviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure.  The motion asserted, inter alia, a claim of ineffective trial counsel in the penalty phase by failing to investigate and present additional mitigating evidence.  In 2008, the state 3.850 court held an evidentiary hearing.[16]  Post-conviction counsel presented the testimony of 10 witnesses: trial counsel Arnaldo Suri and Barry Wax, Dr. Eugenio Rothe, Dr. Ricardo Weinstein, Dr. Deborah Mash, Beatrice Roman,

---

[15]The state trial court also sentenced Mendoza to consecutive sentences of: (1) 15 years for the conspiracy to commit robbery with a deadly weapon conviction; (2) 15 years for the attempted armed robbery with a firearm conviction; and (3) life imprisonment for the armed burglary with an assault conviction.  There was no sentence imposed on the conviction count for use of a firearm during the commission of a felony.  See note 2, supra.

[16]Prior to the evidentiary hearing, there were two appeals from the 3.850 courts' initial denials of Mendoza's motion.  The Florida Supreme Court first required the 3.850 court to conduct an evidentiary hearing, see Mendoza v. State ("Mendoza II"), 817 So. 2d 848 (Fla. 2002) (table op.), and then to give a more thorough statement of reasons for denying Mendoza's 3.850 motion after conducting a new evidentiary hearing, see Mendoza v. State ("Mendoza III"), 964 So. 2d 121, 125 (Fla. 2007).

Dr. Holly Ackerman, Steven Potolsky, Dr. Thomas Hyde, and Dr. Jethro Toomer. We outline their 3.850 testimony.

## A.    Trial Counsel Arnaldo Suri

Trial counsel Suri testified about his work experience at a national law firm, as a state district attorney in two states, and as a criminal defense lawyer. Suri had tried at least 50 jury trials when he represented Mendoza, although his first capital case was Mendoza's.

Suri was primarily responsible for the guilt phase. Suri also represented Mendoza in his other armed robbery case involving Street. Because he spoke Spanish, Suri communicated with Mendoza primarily in Spanish and also met with Mendoza's family members in preparation for the penalty phase.

Suri's testimony established that he knew a great deal about Mendoza's background. Suri spoke to Ms. Mendoza "a lot." Suri learned from her that the refugee camp where the family lived "was horrible" and "[v]ery violent." Suri and Mendoza got along very well and Suri "met with [Mendoza] probably more than [he] ever met with a client in custody." During their meetings, Mendoza told Suri all about his life, including his drug usage, health problems, childhood in Cuba, and experiences in Peru. Suri shared all of this information with co-counsel Wax, and Suri was confident Wax relayed this information to the expert witnesses.

32

Back in 1992, Suri never considered asking for funds to travel to Cuba. As discussed above, Suri did obtain medical records from Cuba to show Mendoza had many issues as a child.

## B.    Trial Counsel Barry Wax

Trial counsel Barry Wax testified first about his criminal defense work experience at the public defender's office in Miami-Dade County, at a law firm, and as a solo practitioner. Wax worked on a capital case before representing Mendoza.

Wax was primarily responsible for the penalty phase. His theory was "to try to establish that [Mendoza] was not the individual that shot the victim Mr. Calderon in this case and to try to establish that it was one of the Cuellar brothers who shot Mr. Calderon." At a minimum, Wax hoped to show that it was the Cuellar brothers' "actions that precipitated Mr. Calderon being killed." "[S]ince they had received plea[] negotiations to . . . lesser sentences[,]" Wax expected that "on a proportionality concept . . . we would be able to persuade a jury that a term of years or a life sentence would be appropriate."

Wax also planned to present a "psychological mental health aspect" of the defense. To do so, Wax first worked with Drs. Haber and Toomer. Wax advised Dr. Toomer to contact the Mendoza family and obtain background information about Mendoza. Wax also obtained a competency evaluation conducted by Dr.

33

Castiello after Mendoza claimed to suffer from hallucinations. After the jury recommended a death sentence, Wax requested the appointment of Dr. Eisenstein to conduct yet another examination. Wax testified that when he decided to hire non-Spanish speaking experts Drs. Haber, Toomer, and Eisenstein, he did so because he "respected them" and felt they were "good witnesses" who could impart "their information to a jury effectively."

Wax also attended many meetings with Mendoza and the family members and "met with [Mendoza's] mother on several occasions with Mr. Suri or one of [Wax's] secretaries translating." Like Suri, Wax never considered requesting funds to travel to Cuba. When asked if he knew of "defense attorneys who [in 1992 through 1994] represented Cuban nationals . . . [who] were going to Cuba to investigate their [clients'] background[s]," Wax said that he was not aware of any attorneys who did so.

## C.    Dr. Eugenio Rothe

Dr. Eugenio Rothe, a forensic psychiatrist, evaluated Mendoza in Spanish in 2007. Dr. Rothe testified that Mendoza suffered from "a residue of mild chronic post-traumatic stress disorder" ("PTSD"), based on his time in the Peruvian embassy in Havana and the Peruvian refugee camp, and that Mendoza "probably had a moderate to severe [PTSD] when he first arrived" in the United States.

34

Dr. Rothe believed that Mendoza's time in Peru, where he lived "with the law of the jungle," caused Mendoza to adopt "an attitude [of] . . . identification with the aggressor." Mendoza saw the world as comprised of victims and victimizers, and "he became identified with the victimizer as a defense of not wanting to be the victim." Dr. Rothe mistakenly believed that Mendoza lived in the Peru refugee camp 12 years, rather than two years and three months years.

Dr. Rothe noted that Mendoza's drug abuse was consistent with PTSD and that Mendoza used marijuana and powder cocaine, but not crack cocaine, as it made him nauseous. Dr. Rothe believed that using drugs made Mendoza "more impulsive" and more "prone to engaging in more violent out-of-control behaviors than somebody who was not using drugs and who would not have history like Mr. Mendoza."

Dr. Rothe administered a specific test for PTSD. Because of the lapse in time (1992 murder to 2007 testing), Dr. Rothe did not intend the test to produce "an exact representation of [PTSD] but just to provide a general view and to look at what specific areas of functioning were affected when he went through all of these experiences in Peru." This testing, and the background experiences Mendoza told Dr. Rothe, led Dr. Rothe to reach his conclusions that Mendoza had "a residue

of mild chronic" PTSD in 2007 and "probably" had "moderate to severe" PTSD when he first arrived in the United States in 1982.[17]

Dr. Rothe believed that Mendoza's "neurological immaturity," as evidenced by his Cuban medical records, made him more likely to suffer PTSD after being exposed to traumatic events in the Peruvian embassy and in Peru. However, Dr. Rothe could not give an accurate diagnosis about Mendoza's mental state at the time of the crime because he did not examine Mendoza back then.

## D.    Dr. Ricardo Weinstein

Dr. Ricardo Weinstein, a forensic neuropsychologist, met with Mendoza four times between 2000 and 2007, speaking Spanish each time. Most of Dr. Weinstein's work in 2008 was related to death penalty cases. Dr. Weinstein testified that, of the over 100 death row inmates he had previously examined, all but one or two had shown signs of frontal lobe damage.

In 2000, Dr. Weinstein administered psychological tests, which showed that Mendoza was not malingering and "had overall brain d[y]sfunction," particularly in the frontal lobe area. In 2002, Dr. Weinstein administered another test designed to measure Mendoza's executive functioning. This test showed a "very significant d[y]sfunction" in the frontal lobes, but other parts of Mendoza's brain appeared

---

[17]Dr. Rothe also suspected the following conditions were present: (1) attention deficit hyperactivity disorder; (2) polysubstance dependence in remission; (3) psychosis not otherwise specified; and (4) a learning disability in the verbal area of functioning.

36

normal.  For example, Dr. Weinstein noted that Mendoza did "consistently well in terms of . . . ability for attention."

Dr. Weinstein determined that Mendoza suffered from brain dysfunctions in the frontal lobe leading to "significant impairment."  This brain dysfunction was "the result of developmental and acquired" aspects.  Dr. Weinstein stated that Mendoza could "plan some actions and . . . decide what he's going to do," but could not "really look at the world and put together . . . information . . . in such a way that" he could make long-term plans and behave accordingly.

## E.    Dr. Deborah Mash

Dr. Deborah Mash, a neuropharmacologist and an expert on substance abuse, testified that Mendoza had a "very severe" drug addiction.

In reaching this conclusion, Dr. Mash reviewed, inter alia, Mendoza's "social family history," his Cuban medical information, the mental health expert reports prepared prior to the trial, Mendoza's school records, his prison medical records, "depositions," and "hearing transcripts."  She also interviewed Mendoza once in 2007.  Dr. Mash believed that Mendoza committed his crime "when he was under extreme emotional disturbance due to his substance abuse."

## F.    Beatrice Roman

Beatrice Roman, a social worker who lived and worked in Peru in the 1980s, testified about conditions in the Cuban refugee camps there and her meeting

Mendoza's father at the camp.  Ms. Roman said that there were approximately 150 tents in the camp.  The refugees often had to wait in line to use the restrooms, and hygiene in the camp was "very bad."

Mendoza's father came to Ms. Roman's office requesting assistance; Ms. Roman's office "bought him a vehicle" to use as a taxi cab.  Ms. Roman believed that she met Mendoza, but did not remember much about him.

## G.    Dr. Holly Ackerman

Dr. Holly Ackerman, a research librarian and professor, interviewed Mendoza about his experiences at the Peruvian embassy in Havana and the refugee camps in Peru.  According to Dr. Ackerman, Mendoza related that there were approximately 10,800 people crowded into a 2,000-square-foot area at the embassy and people were thus "unable to move freely around."  Mendoza said that riots broke out due to food shortages.  At the refugee camps, Mendoza witnessed "people being hacked and stabbed," as well as other acts of violence.  Mendoza said to her that "the camp was entirely surrounded by military personnel but there was no policing inside and so people were left entirely to their fate."

## H.    Steven Potolsky

Steven Potolsky, a Florida attorney, testified as an expert about the standards of professional conduct for capital defense attorneys in the 1990s.  Mr. Potolsky acknowledged that he had hired Dr. Toomer as the sole mitigation expert in a

38

capital case.  Mr. Potolsky admitted that he was unaware of any capital defense attorney in south Florida who had requested funds to travel to Cuba in search of mitigation evidence on behalf of a Cuban immigrant-defendant.

## I.    Dr. Thomas Hyde

In 2007, Dr. Thomas Hyde, a neurologist, evaluated Mendoza in English for two hours.  Mendoza described his life experiences to Dr. Hyde.  Based on this description, Dr. Hyde suspected PTSD, although he was not qualified to diagnose that condition.  Dr. Hyde did not identify any events in Mendoza's background causing him to suspect brain injury.

For example, Mendoza had no known "traumatic loss of consciousness, of great significance, no skull f[r]actures, no seizures, no strokes, no fainting spells, no history of meningitis or [encephalitis], no history of chronic headaches, [and] no history of brain tumors."  Mendoza's behavioral problems caused Dr. Hyde to suspect "developmental brain problems" and "residual attention problems into adulthood and perhaps frontal lobe problems."  Mendoza had a "significant substance abuse history."  The neurological tests Dr. Hyde performed showed no abnormalities other than mild visual deficits.

On cross-examination, Dr. Hyde revealed that Mendoza had told him that, although he was using marijuana and alcohol the day before the crime, he was not using cocaine.  Mendoza also claimed that he "[w]as not 'high' or 'drunk,' when

39

he committed the crime."[18]  Dr. Hyde did not believe that Mendoza used alcohol to the extent that he would experience withdrawal symptoms.

## J.    Dr. Jethro Toomer

At the 3.850 hearing, Dr. Toomer, the forensic psychologist from the trial, testified again.  When he evaluated Mendoza prior to the 1994 trial, Dr. Toomer did not receive any medical or school records on Mendoza, did not speak to Mendoza's family, and expected that he would have been asked to perform additional evaluations of Mendoza's condition.  Dr. Toomer admitted, however, that he learned from Mendoza much of the information that would have been in medical records, including Mendoza's trips to see a psychiatrist in Cuba and his history of drug use.  And, thus, Dr. Toomer confirmed that he did not fail to do any specific thing due to a lack of medical records.

## IX.  STATE COURTS' DENIAL OF 3.850 MOTION, 2009–2011

## A.    State 3.850 Court Order, 2009

On April 8, 2009, the 3.850 court issued a thorough, 30-page order making factual findings and denying Mendoza's amended 3.850 motion.  The 3.850 court

---

[18]Post-conviction counsel intended to call Lionel Perez, who was Mendoza's high school friend and who would have testified that he did a lot of drugs with Mendoza.  However, Mendoza informed the 3.850 court that he did not wish for Perez to testify.

Additionally, post-conviction counsel told the 3.850 court that she believed "that Mr. Mendoza [was] going to do something extremely detrimental to his case if [she went] ahead and call[ed] [Perez]."  Mendoza added that if post-conviction counsel "forced [him] to put Lionel Perez [on]," he would "waive all [his] mitigation."  Therefore, post-conviction counsel "reluctantly" made the strategic decision not to call Perez.

discussed in detail Mendoza's claim of ineffective trial counsel.  As to evidence

that Mendoza was a heavy drug user, the 3.850 court noted that Mendoza's mother

"testified about his drug use at trial," as did Dr. Toomer.  Dr. Eisenstein testified,

in his deposition, about drug use during the penalty hearing before the trial court.

The 3.850 court noted, "even if counsel presented no evidence on this issue,

counsel cannot show prejudice since [Mendoza's] own expert [Dr. Hyde] testified

[at the 3.850 evidentiary hearing] [Mendoza] was not high" at the time of

Calderon's murder.

As to Mendoza's time in the Peruvian embassy and in Peru, the 3.850 court

found that: "[Mendoza's] mother testified at the penalty phase about the horrible

conditions in the Peruvian Embassy and how family members, including

[Mendoza,] were beat up.  [Mendoza's] mother testified about the trip from Cuba

and the living conditions in the Peruvian camps."  The court considered Ms.

Roman's testimony cumulative of Ms. Mendoza's testimony.  The court noted that

Ms. Roman did not know Mendoza and did not know of any specific incident that

may have affected Mendoza.

As to experts in addictionology, the 3.850 court noted, "Barry Wax testified

that he asked the [trial] court to appoint Dr. Tropp, an expert in the field of

addiction.  That motion was denied.  Counsel cannot be deemed ineffective for

asking for and not receiving an expert in the field of addictionology."  More

importantly, trial counsel had both Dr. Toomer and Dr. Eisenstein appointed to evaluate Mendoza, and both experts testified. Thus, trial counsel did present mental health mitigation.[19]

## B.    Florida Supreme Court Decision, 2011

Mendoza appealed, and the Florida Supreme Court affirmed the denial of his 3.850 motion. See Mendoza v. State ("Mendoza IV"), 87 So. 3d 644 (Fla. 2011).

As for Mendoza's claim of ineffective trial counsel, the state supreme court correctly noted that the claim was governed by the two-prong standard in Strickland v. Washington. Id. at 651–52, 657 (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) (requiring a petitioner alleging ineffective counsel to show both deficient performance and prejudice)).

The state supreme court summarized the evidence presented at the guilt phase, the penalty phase both before the jury and judge, and during the 3.850 evidentiary hearing. Id. at 648–50, 658–59. The state supreme court made several conclusions. First, the state supreme court concluded that: "Upon careful review of both the penalty-phase transcript and the evidentiary hearing transcript, we agree with the circuit court that the jury and trial judge heard the childhood,

_____

[19]As to Mendoza's other new experts, the 3.850 court found: (1) Dr. Rothe "did not work on cases involving adults in the 1990's, only juveniles," and therefore "would not have been available to evaluate [Mendoza] at the time of the trial or to have testified at the trial"; and (2) Dr. Ackerman "was a student during the years 1992-1994 and was not qualified as an expert during that time." The Florida Supreme Court specifically affirmed the fact-finding regarding Dr. Ackerman. See Mendoza v. State, 87 So. 3d 644, 665 (Fla. 2011).

medical, and psychological information that Mendoza alleged counsel failed to discover and present." Id. at 659. The court observed, "the presentation of cumulative evidence in the postconviction proceedings does not provide a basis for determining that trial counsel's performance was deficient." Id.[20]

Second, the state supreme court concluded that Mendoza took "issue with the manner in which trial counsel presented the evidence" in the penalty phase, but that was not a proper basis to establish deficient performance. Id. In so concluding, the Florida Supreme Court cited Everett v. State, and quoted its statement: "'That there may have been more that trial counsel could have done or that new counsel in reviewing the record with hindsight would handle the case differently, does not mean that trial counsel's performance . . . was deficient.'" Id. (quoting Everett v. State, 54 So. 3d 464, 478 (Fla. 2010)).

Third, the state supreme court concluded that Mendoza had later found an expert whose testimony was more favorable "as to the degree of his mental status impairment," but that subsequently obtaining a more favorable mental status assessment did not establish that trial counsel's investigation was deficient. Id.

---

[20]Generally speaking, these statements were accurate, as the jury did hear about Mendoza's childhood, medical background, and psychological evaluations—including Dr. Toomer's several diagnoses. As noted above, it was not until Dr. Rothe's examination in 2007 that Mendoza was diagnosed with PTSD, and thus, we recognize that the jury in 1994 did not hear that diagnosis. However, we do not read the Florida Supreme Court to say that the two prior psychological experts' diagnoses—i.e., Dr. Toomer's and Dr. Eisenstein's—about Mendoza were exactly the same as Dr. Rothe's subsequent diagnosis, but only that the jury and trial court did hear psychological information about Mendoza and that psychological information was presented again in the 3.850 hearing.

Dr. Toomer was Mendoza's mental health expert at trial, and the Florida Supreme Court noted that Mendoza's own legal expert, Mr. Potolsky, testified that he had used Dr. Toomer as the sole mental health expert in a capital case in this time period. Id. In other words, that Mendoza had now found more favorable experts (such as Dr. Rothe and Dr. Hyde) did not make trial counsel deficient in selecting Dr. Toomer and relying on his evaluation. See id.

## X. FEDERAL HABEAS PROCEEDINGS, 2012–2014

On May 18, 2012, Mendoza filed a federal habeas petition under 28 U.S.C. § 2254. Mendoza's petition asserted, inter alia, that he was denied his right to the effective assistance of counsel in the penalty phase of his trial. The petition alleged that Mendoza's trial attorneys failed to adequately investigate Mendoza's mental health and background.

On July 25, 2013, the district court issued a 75-page order denying Mendoza's § 2254 petition. The district court specifically addressed at length Mendoza's claim of ineffective trial counsel in the penalty phase due to failure to investigate and present mitigation evidence—the claim for which Mendoza received a COA from this Court.

The district court acknowledged that the Florida Supreme Court ruled on only Strickland's performance prong. As to performance and in light of U.S. Supreme Court precedent, the district court concluded Mendoza had not shown

"that the Florida Supreme Court's decision was an unreasonable application of clearly established federal law." The district court cited and discussed at length the Supreme Court's seven recent ineffective counsel decisions and concluded Mendoza had failed to establish deficient performance.[21] Mendoza timely appealed.

## XI.  STANDARD OF REVIEW

Mendoza's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Recognizing that "[s]tate courts are adequate forums for the vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. —, —, 134 S. Ct. 10, 15–16 (2013).  Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —, —, 131 S. Ct. 770, 786–87 (2011).  The "purpose of AEDPA is to ensure that federal habeas

---

[21]The decisions the district court discussed and analyzed at length were: (1) Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003); (2) Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005); (3) Bobby v. Van Hook, 558 U.S. 4, 130 S. Ct. 13 (2009); (4) Wong v. Belmontes, 558 U.S. 15, 130 S. Ct. 383 (2009); (5) Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447 (2009); (6) Sears v. Upton, 561 U.S. 945, 130 S. Ct. 3259 (2010); and (7) Cullen v. Pinholster, 563 U.S. —, 131 S. Ct. 1388 (2011).

45

relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene v. Fisher, 565 U.S. —, —, 132 S. Ct. 38, 43 (2011) (quotation marks omitted).

AEDPA permits federal courts to grant habeas relief only when the state court's adjudication: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The phrase "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of [the U.S. Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). The phrase "contrary to" means that the state court decision "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." Kimbrough v. Sec'y, DOC, Fla., 565 F.3d 796, 799 (11th Cir. 2009). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the U.S. Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quotation marks omitted).

The standard of § 2254(d) is "difficult to meet . . . because it was meant to be." Titlow, 134 S. Ct. at 16 (quotation marks omitted). This "highly deferential standard" demands that "[t]he petitioner carries the burden of proof," Cullen v. Pinholster, 563 U.S. —, —, 131 S. Ct. 1388, 1398 (2011) (quotation marks omitted), and "that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002).

## XII.  DISCUSSION

### A.    The Strickland Standard

Mendoza's claim is governed by the Supreme Court's two-pronged test announced in Strickland. See Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252, 1269 (11th Cir. 2012). Under Strickland, to establish constitutionally ineffective counsel, a defendant must show that (1) his attorney's performance was deficient and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

The Strickland performance standard is "objectively reasonable attorney conduct under prevailing professional norms." Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010); see Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). We look at what professional norms existed at the time that the attorney acted. See Johnson v. Sec'y, DOC, 643 F.3d 907, 931

47

(11th Cir. 2011).  To show that an attorney failed to discharge his Sixth

Amendment duty, a petitioner must establish that the attorney's conduct

"amounted to incompetence under 'prevailing professional norms.'"  <u>Richter</u>, 131

S. Ct. at 788 (quoting <u>Strickland</u>, 466 U.S. at 690, 104 S. Ct. at 2066).

A petitioner bears the burden of proving, "by a preponderance of competent

evidence, that counsel's performance was unreasonable."  <u>Chandler v. United</u>

<u>States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); <u>accord</u> <u>Richter</u>, 131 S. Ct.

at 790 ("<u>Strickland</u> . . . calls for an inquiry into the objective reasonableness of

counsel's performance, not counsel's subjective state of mind.").

Because it would be "all too easy for a court, examining counsel's defense

after it has proved unsuccessful, to conclude that a particular act or omission of

counsel was unreasonable . . . a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional

assistance."  <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065.  This presumption

insulates all but those errors that are "so serious that counsel was not functioning

as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id.</u> at 687,

104 S. Ct. at 2064.

For prejudice, the standard is whether "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have

been different."  <u>Rose v. McNeil</u>, 634 F.3d 1224, 1241 (11th Cir. 2011) (quoting

48

Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).  To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792.  "Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 787–88 (quotation marks omitted).

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Id. at 788.  "Where the highly deferential standards mandated by Strickland and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Downs v. Sec'y, Fla. Dep't of Corr., 738 F.3d 240, 258 (11th Cir. 2013) (quotation marks omitted), pet. for cert. filed, No. 13-1356 (U.S. May. 8, 2014).  "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Knowles, 556 U.S. at 123, 129 S. Ct. at 1420 (quotation marks omitted).  If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state court decision denying the claim.  Richter, 131 S. Ct. at 788.

## B.    Mendoza's Claim – AEDPA Deference

49

As a threshold matter, we reject Mendoza's contention that the district court erred by applying AEDPA deference to the Florida Supreme Court's 3.850 decision. Mendoza points to the Florida Supreme Court's statement that he took "issue with the manner in which trial counsel presented the evidence at trial," see Mendoza IV, 87 So. 3d at 659, and argues that this statement revealed that the state supreme court misunderstood his claim. He then maintains that, in light of this error, the Florida Supreme Court's opinion is not entitled to AEDPA deference and that his claim should be reviewed de novo.

Mendoza's argument ignores that he acknowledged in his § 2254 petition that AEDPA governed the district court's analysis of his claims. In Mendoza's petition and legal memorandum, Mendoza also did not argue for de novo review before the district court. Thus, he cannot now argue for the first time on appeal for a different standard of review. See Hurley v. Moore, 233 F.3d 1295, 1297 (11th Cir. 2000) (stating, in a § 2254 case, "[a]rguments raised for the first time on appeal are not properly before this Court").

In any event, we conclude AEDPA deference applies to the Florida Supreme Court's performance ruling. The Florida Supreme Court conducted a lengthy discussion of the mitigation evidence that trial counsel presented through Dr. Toomer, Dr. Eisenstein, and Ms. Mendoza. See Mendoza IV, 87 So. 3d at 658–59. The Florida Supreme Court then acknowledged that, Mendoza's post-conviction

50

counsel presented testimony in the 3.850 hearing from these witnesses: "attorney

Steven Potolsky, psychiatrist Dr. Eugenio Rothe, psychologist Dr. Ricardo

Weinstein, Dr. Debra Mash, a professor of neurology and pharmacology, Beatrice

Roman, a social worker living in Peru who works with Cuban refugees,

psychologist Dr. Jethro Toomer, and Dr. Thomas Hyde, a specialist in behavioral

neurology and neuropsychology." Id. at 659.

The Florida Supreme Court clearly understood the nature of Mendoza's

claim, which was that his trial counsel failed to investigate, discover, and present

mitigation evidence. The Florida Supreme Court knew that Mendoza had

presented new witnesses and evidence at the 3.850 hearing. After considering all

of the 3.850 evidence, the state supreme court concluded, inter alia, that the fact

that the testimony of the new experts "may be more favorable as to the degree of

[Mendoza's] mental status impairment does not establish that trial counsel's

investigation was deficient." Id. Therefore, we are not persuaded by Mendoza's

argument and must apply the AEDPA deference standard to the Florida Supreme

Court's decision on Mendoza's claim of ineffective trial counsel.

## C.    Mendoza's Claim – Performance Prong

Based on the record here, Mendoza has come nowhere close to satisfying the

combined Strickland-AEDPA standard requiring double deference. Mendoza has

failed to show the Florida Supreme Court's decision on the performance prong was

51

an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

"As for the [Strickland] performance prong, when a Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact." Bishop v. Warden, GDCP, 726 F.3d 1243, 1257 (11th Cir. 2013) (quotation marks omitted); see also Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1194–95 (11th Cir. 2013), cert. denied sub nom., Lee v. Thomas, No. 13-775, 134 S. Ct. 1542 (Mar. 24, 2014). As detailed earlier, in preparation for the penalty phase, Mendoza's trial counsel did a great deal.

Trial counsel conducted a reasonable investigation of Mendoza's background and developed a penalty phase-mitigation strategy supported by the evidence that the investigation produced. Trial counsel not only thoroughly investigated Mendoza's mental health, but also looked into other aspects of Mendoza's background to discover mitigating evidence. As recounted above, trial counsel met with Mendoza and his family members on many occasions before trial. In fact, trial counsel Suri, an experienced criminal defense lawyer, stated that he met with Mendoza more than he met with any other client in custody and that he formed a strong relationship with Mendoza. Trial counsel, through Ms. Mendoza, also obtained Mendoza's childhood medical records from Cuba. Trial

52

counsel called Ms. Mendoza as a witness, and she testified at length about Mendoza's upbringing and struggles in Cuba, Peru, and the United States.

Trial counsel Suri and Wax also had Mendoza examined by three mental health experts—Drs. Haber, Toomer, and Eisenstein. The record shows that all three doctors were well-qualified experts and gave a multiplicity of tests to Mendoza. All three experts issued reports with detailed facts and conclusions about Mendoza's mental health and substance abuse. Mendoza has wholly failed to show that seeking out and obtaining the three experts and their evaluations was deficient performance.

In arguing that trial counsel's preparation and presentation of mental health expert testimony was deficient, Mendoza compares this case to Hinton v. Alabama, 571 U.S. —, 134 S. Ct. 1081 (2014). But, Hinton is entirely different. In Hinton, the Supreme Court held that trial counsel was deficient for failing "to request additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he had received all he could get under [state] law." Id. at 1088. Here, there is no suggestion that trial counsel considered Drs. Haber, Toomer, or Eisenstein to be anything other than competent witnesses. And, trial counsel were not under any false impressions about the resources available to him. In fact, the opposite of what happened in Hinton happened here—trial counsel

53

obtained funding for three expert witnesses.  We are not persuaded by the reference to Hinton.

Mendoza complains that Dr. Toomer did not conduct his mental health examinations in Spanish.  Trial counsel retained Dr. Haber, who did examine Mendoza in Spanish, and reached conclusions similar to those reached by Dr. Toomer.  Also, the record is replete with evidence that Mendoza spoke and understood English.  Mendoza's own 3.850 expert, Dr. Hyde, examined Mendoza in English and felt that doing so was appropriate.

Mendoza also contends trial counsel were deficient for not obtaining further testing after Dr. Toomer's pre-trial evaluation.  But, counsel did obtain additional testing before the penalty hearing before the trial judge—Dr. Eisenstein examined Mendoza for the defense, and Dr. Puentes did so for the State.[22]  In fact, trial counsel did what Mendoza claims should have been done.

Mendoza also takes issue with trial counsel's failure to provide Dr. Toomer with background information about Mendoza or access to Mendoza's family members.  But, at the 3.850 hearing, trial counsel Wax testified that he instructed Dr. Toomer to speak with Mendoza's family members.  Notably, Dr. Toomer met

---

[22]Dr. Eisenstein's testing occurred after the jury's recommendation of death.  However, trial counsel did present mental health evidence from Dr. Toomer and the medical records from Cuba to the jury.  Further, Dr. Eisenstein's testing occurred before Mendoza's final hearing before the state trial court where the death sentence was imposed.  As the jury's verdict was only advisory and the state trial court had the ultimate sentencing authority, we cannot say that the failure to present Dr. Eisenstein's evidence to the jury, when the evidence was presented to the ultimate sentencer, was deficient performance.

54

with Mendoza four times and Mendoza fully related his social, medical, and educational background. At trial, Dr. Toomer testified that he did not need more background information to reach his conclusions.

Mendoza also claims that trial counsel failed to discover that he had PTSD. But, trial counsel did arrange for Mendoza to be tested by Drs. Haber, Toomer, and Eisenstein. None of those doctors even recommended further PTSD testing. Notably, Dr. Rothe's PTSD diagnosis, made in 2007—at least 25 years after Mendoza suffered trauma in Peru—was tentative and suspect. For example, Dr. Rothe testified that he thought Mendoza spent 12 years in Peru. But, the trial evidence showed that Mendoza was in Peru for only two years and three months. This discrepancy reveals that Dr. Rothe had a false impression of how much trauma Mendoza had experienced. Additionally, Dr. Rothe himself acknowledged that Mendoza may have been malingering.[23]

As for Mendoza's substance abuse, both Ms. Mendoza and Dr. Toomer testified about this abuse, and Dr. Eisenstein's report and deposition included details about substance abuse as well. Trial counsel tried to find an additional source of testimony about substance abuse—Dr. Tropp, an addictionologist—but the state trial court denied that request. Further, the 3.850 evidence casts doubt on

---

[23]Notably, too, PTSD evidence—including testimony that Mendoza was "impulsive" and "prone to engaging in . . . violent out-of-control behaviors"—was a double-edged sword and may not have helped Mendoza anyway.

just how bad Mendoza's substance abuse problem actually was. For example, Mendoza's expert, Dr. Rothe, testified that Mendoza had only tried crack cocaine and did not like it because it made him nauseous. Dr. Hyde, another defense expert, testified that Mendoza was not under the influence of a controlled substance at the time of the crime and was not so addicted to alcohol that he would experience withdrawal symptoms.

Even if the jury credited Mendoza's substance abuse evidence, it is not clear that the evidence would have helped Mendoza. We have previously noted that "even when there is a factual basis for it, a showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing." Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999); see Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001) ("[W]e note that emphasizing [the petitioner's] alcoholic youth and intoxication may also have been damaging to [the petitioner] in the eyes of the jury."); see also Pooler, 702 F.3d at 1274–75. This is because substance abuse evidence "provides an independent basis for moral judgment by the jury." Cade v. Haley, 222 F.3d 1298, 1306 (11th Cir. 2000).

The record suggests that trial counsel Suri and Wax were aware of the potential harm that substance abuse evidence could do to their mitigation case. Before trial, they obtained Dr. Haber's report, which described Mendoza's use of

acid for almost a full year and Mendoza's experimentation with Quaaludes and black beauties. Dr. Haber also noted Mendoza's "homicidal ideations" and that he experienced hallucinations when using drugs. Not surprisingly, trial counsel decided not to call Dr. Haber as a witness, and thus, the jury did not hear about Mendoza's use of these drugs—acid, black beauties, and Quaaludes—and the effects they had on him.

Mendoza also argues on appeal that more should have been said about his times at the Peruvian embassy in Havana and at the refugee camp in Peru. As outlined above, Ms. Mendoza did testify about these experiences. In any event, Ms. Mendoza and petitioner Mendoza were the ones who lived in these places and knew all about their experiences there. If Mendoza's attorneys were less than informed about Mendoza's experiences in these places, it was because Mendoza and his mother were less than forthcoming. "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood [troubles] that his client does not mention to him." Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 905 (11th Cir. 2014) (quotation marks omitted), pet. for reh'g denied, (11th Cir. July 11, 2014); Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1281 (11th Cir. 2013) (collecting cases), pet. for cert. filed, No. 13-1349 (U.S. May 8, 2014).

Mendoza even argues that his attorneys should have gone to Cuba or Peru in search of mitigating evidence. But, the 3.850 evidence made clear that, in 1994, it was not within the prevailing professional norms at the time for attorneys representing Cuban immigrants to travel abroad to track down mitigating evidence about their clients. To the extent Mendoza claims trial counsel should have called expert witnesses to testify about the historical events in which he participated, Mendoza offered no testimony to show that it was common (or even uncommon) practice in 1994 for defense attorneys to attempt to offer expert testimony about historical events when representing defendants who actually lived through those events.

Given the record and the combined Strickland-AEDPA deferential standards, we conclude that Mendoza has not shown that the Florida Supreme Court's decision was an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

## XIII.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mendoza's § 2254 petition.

**AFFIRMED.**

58